UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD FERRARI and ROBERT MOORE,

                           Plaintiffs,        06-cv-6525

              v.                              **DECISION
                                              and ORDER**

KEYBANK NATIONAL ASSOCIATION a/k/a
KEYBANK, N.A.,

                           Defendant.
_____

## **INTRODUCTION**

     Plaintiffs Richard Ferrari ("Ferrari") and Robert Moore
("Moore") (collectively "plaintiffs") brought this action in New York
State Supreme Court, Monroe County, seeking damages against defendant
Keybank National Association a/k/a Keybank, N.A. ("Keybank" and/or
"defendant"), for Keybank's alleged breach of contract, breach of
implied covenant of good faith and fair dealing claims, violation of
New York's Labor Law, as well as several other common law claims
including promissory estoppel and unjust enrichment. Specifically,
plaintiffs contend that Keybank breached an agreement by failing to
pay them the full amount of their incentive compensation. Keybank
moves for summary judgment on all counts of the Complaint claiming
that there are no material issues of fact in dispute, and that it is
entitled to judgment as a matter of law. Plaintiffs oppose Keybank's
motion, and cross-move for summary judgment. For the reasons set
forth below, I grant Keybank's motion for summary judgment, and deny
plaintiffs' cross-motion for summary judgment.

## BACKGROUND

### I.   Plaintiffs

Plaintiffs Ferrari and Moore were employed by Keybank during the period including January 1, 2000 through December 31, 2000 as commercial bankers in Keybank's commercial middle market ("CMM") banking division. See Defendant's Statement of Material Facts, ("DSOMF"), ¶13. In 2000, Moore was employed by Keybank in the Rochester Community Middle Market Group as a Relationship Manager ("RM") and Ferrari was employed as a Team Sales Leader ("TSL").[1] See Plaintiffs' Statement of Material Facts, ("PSOMF") ¶¶1-2. Both plaintiffs received a fixed salary in 2000. See DSOMF, ¶19, 21. For the period January 1 to March 31, 2000, Moore's fixed base salary was $77,000 and from April 1 to December 31, 2000 it was $78,000. See id., ¶22. Meanwhile, Ferrari's fixed base salary was $87,720 from January 1 through March 31, 2000 and $90,000 from April 1 through December 31, 2000. See id., ¶20.

### II.  The Incentive Plan

On or about December 30, 1999, defendant instituted "The 2000 Commercial Banking Middle Market Sale Team Incentive Plan" ("Incentive Plan"). See DSOMF, ¶1. It was during this time that plaintiffs, among others, received a letter via e-mail from Patrick Auletta, ("Auletta"), Keybank President of Commercial Banking, which

---

[1] Essentially, plaintiffs were members of the Rochester Community Middle Market sales team. See DSOMF, ¶14. Mackin was the Compensation Manager for Keybank in 2000. See PSOMF, ¶5.

provided the recipients with an overview of the Incentive Plan.[2] See PSOMF, ¶9. Attached to Auletta's e-mail was a link that included an Incentive Calculator ("Calculator"), which was accurate. See id., ¶10, 13. The Calculator provided eligible participants with a mechanism that would permit them to obtain a current update of incentive compensation eligibility predicated on their individual and team activity on a month-to-month and year-to-year basis. See id., ¶11. In addition, eligible participants in the Incentive Plan had access to the Calculator throughout the entire year of 2000. See id., ¶12. Plaintiffs claim that they relied on the Calculator to provide them with information as to the amount of their incentive compensation. See id., ¶14.

Plaintiffs initially became aware of the Plan in October 1999 at a National Sales Conference in Grand Traverse, Michigan. See id., ¶3. During that time, Auletta stated that the incentive compensation provided for under the Incentive Plan was an integral part of the overall compensation. See id. Defendants contend that any incentive compensation distributed to an eligible employee was in addition to any fixed salary provided to that employee. See DSOMF, ¶18.

The Incentive Plan was a valid and enforceable written employment contract to which plaintiffs were subject. See id., ¶2.

---

[2] As employees of Keybank's commercial banking division, plaintiffs were eligible to participate in the Incentive Plan and eligible to receive compensation, subject to its terms and conditions. See id., ¶¶ 5,8.

Under the heading "Plan funding and award allocation measures," the

Plan Summary page of the Incentive Plan states in part:

> The individual and team components will be earned and
> allocated pursuant to a non-discretionary formula. The
> discretionary component will be funded by a non-
> discretionary formula, and the pool is to be allocated at
> the discretion of management. Specific details are provided
> in Section 2 [of the Incentive Plan]. Sample award
> calculations are detailed in Section 2 [of the Incentive
> Plan].

See PSOMF, ¶26. Section 2 of the Incentive Plan distinguishes between

TSLs and RMs as it relates to incentive compensation. See id., ¶21.

Both the TSL and RM incentive compensation contain a) an individual

award component; b) a team component; and c) a discretionary

component. See id., ¶22. Further, Section 2 provides in part:

> The Pool for the Team incentive will be funded based upon
> the performance of the applicable Community Middle Market
> ... Team. The basis of performance measurement for the Team
> award funding is the Contribution Margin (CM), as reported
> by KEIS, as a percentage of the Team plan. If Team level
> financials compared to plan are not available, then Team
> performance will be estimated based upon the best available
> Line of Business financial information. In all instances,
> consideration will be given to actual loan loss provision
> and asset quality.

See DSOMF, ¶3. According to defendant, "Contribution Margin" is

generally defined as the revenue generated by a team from the sale to

customers of bank products (e.g. loans, lines of credit etc.), less

direct expenses. See id., ¶4. Moreover, "KEIS" refers to Keybank's

internal bank computer program which maintains customer information,

including the Contribution Margin for bank products utilized by each

customer. See id., ¶5. In addition, Section 2 of the Incentive Plan

states "the actual award amount is determined by the [Team Payout Schedule]" which allocates the Team Award pool based on Performance Level. <u>See</u> Defendant's Response to PSOMF, ¶26.  Section 2 also states "Measurement of the Team level performance (actual or estimated) will be made by the Key Corporate Capital & Special Finance Unit Finance group, Commercial Bank LOB Executive and the Plan Administrator." <u>See</u> <u>id.</u>

Further, Section 3.1 of the Incentive Plan provides in part:

> In the event that (1) the design, structure and/or operation of the Plan, or (2) unanticipated market related events or circumstances result in an unanticipated or unintentional calculation, amount, duration, or structure of any incentive payment(s) to be made under the Plan, KeyCorp retains the absolute and unconditional right at all times to increase, decrease, or terminate any incentive formulas, targets and/or goals, to increase, decrease or terminate any, and all incentive awards to be paid under the Plan.

<u>See</u> DSOMF, ¶6. Section 3.2 also provides in part:

> KeyCorp may, in its sole and absolute discretion...modify Participant's performance objectives [and/or] modify applicable Plan incentive goals....Such modifications may be made on a retroactive basis if KeyCorp determines that such modifications are necessary to accurately reflect the actual rather than the projected or anticipated rate of earnings[.]

> As a condition of participating in the Plan, the Participant acknowledges that he or she understands KeyCorp's reservation of rights with regard to the payment of any and all incentive awards under the Plan, and the Participant agrees to be bound to the provision of Section 3.1 and this Section 3.2 hereof.

<u>See</u> <u>id.</u>, ¶7. Moreover, Section 3.8 provides in part:

> The Plan Administrator shall verify the amount of incentive awards, if any, to be paid to the Participant in accordance

with the provisions of the Plan. The reasonable and
equitable decision of the Plan Administrator as to the
value of each incentive award shall be conclusive and
binding upon all Participants[.]

See id., ¶8. Section 3.11 also provides in part:

[Key Capital & Special Finance Unit Finance Group, as The
Plan Administrator]...shall have sole and absolute
discretionary authority and power to carry out the
provisions of the Plan, including, but not limited to, the
authority and power (a) to determine all questions relating
to the eligibility for and the amount of any benefit to be
paid under the Plan, (b) to determine all questions
pertaining to claims for benefits under the Plan...and, (d)
to take such further action as [KeyBank] shall deem
necessary or advisable in the administration of the Plan.

See id., ¶9. Section 3.12 further provides in part:

KeyCorp reserves the right to amend and/or terminate the
Plan at any time...and to modify or amend the Plan, in
whole or in part, at any time and for any reasons.

See id., ¶10.

    KeyBank "stress tested" the Incentive Plan before it was
implemented in order to evaluate the potential range of overall
funding for the Incentive Plan. See PSOMF, ¶¶15-16. During its testing
of the Incentive Plan, there were scenarios where small CMM teams
outperformed larger CMM teams. See id., ¶17. Defendant determined
that the payout schedule set forth in the Incentive Plan was sound
provided that the sales teams stayed within their market segment. See
id., ¶18. Plaintiffs contend that in 2000, KeyBank's Rochester CMM
"segment" was composed of companies that had annual sales between $5
million and $25 million. See PSOMF, ¶19. Defendant, however, claims
that in 2000 KeyBank's Rochester CMM "segment" was comprised of

companies that had an annual revenue between $3 million and $10 million. See Defendant's Response to PSOMF, ¶19. Moreover, plaintiffs argue that all of Rochester's CMM business in 2000 were within "segment" except for a single transaction for which permission to consummate was given by KeyBank. See PSOMF, ¶20. Defendant claims that Rochester's CMM team went out of "segment" in 2000 without receiving prior approval from KeyBank. See Defendant's Response to PSOMF, ¶20.

### III. <u>Team Award Component of the Incentive Plan</u>

Defendant contends that Keybank considered the following factors before awarding team incentive compensation under the Incentive Plan: (a) the earnings of the particular team; (b) the earnings of the entire community middle market division nationwide; and (c) KeyBank's earnings. See <u>id.</u>, ¶16. Plaintiffs argue that the Incentive Plan does not contain any correlation between the plaintiffs' incentive compensation award and Keybank's earnings. See Plaintiffs' Reply to DSOMF, ¶16. Defendant also claims that the team award component uses a formula to develop a team incentive award that is not final. See DSOMF, ¶12. Plaintiffs, on the other hand argue that the Incentive Plan provides a non-discretionary formula for funding and allocating the team award. See Plaintiffs' Reply to DSOMF, ¶12. Both parties agree that the Rochester CMM sales team's team incentive award was

based in part on factors outside of a particular team member's individual performance. See DSOMF, ¶17.

It is undisputed, for purposes of this summary judgment motion, that the individual component of both plaintiffs' incentive awards provided under the Incentive Plan were not adjusted. See id., ¶¶ 23-24. It was only the team component of both plaintiffs' incentive awards set forth under the Incentive Plan that was adjusted. See id. ¶¶ 25, 27. Ferrari's incentive compensation was adjusted from $256,300 to $87,076 and Moore's was adjusted from $166,914 to $54,549. See id. ¶¶ 26, 28. Keybank informed plaintiffs in March 2001 that the reason for the adjustment was that the method of calculating the incentives resulted in an unexpected windfall to plaintiffs and that defendant reserved the right under the Incentive Plan to alter the method of calculating payments under such situations. See id., ¶29.

Defendant contends and plaintiff denies that the original (unadjusted) team incentive award for the Rochester CMM sales team was, as a percentage of the team's contribution margin, 32%. See DSOMF, ¶30; Plaintiff's Reply to DSOMF, ¶30. However, it is undisputed that the original (unadjusted) team incentive award for KeyBank's entire CMM division nationwide was, as a percentage of its contribution margin, 4%. See DSOMF, ¶31. After the adjustments were made, the Rochester CMM sales team was, as a percentage of the team's contribution margin, 15% and the team incentive award for KeyBank's

entire CMM division nationwide, as a percentage of its contribution margin, was 3%. See id., ¶¶ 32-33.

It is undisputed that the funding of the Team Award component of the Incentive Plan for both RMs and TSLs was non-discretionary. See PSOMF, ¶25. Plaintiffs contend that the team awards for TSLs and RMs are based on a formula tied to the CM and the cumulative payout as it relates to the team awards for both TSLs and RMs was unlimited once the CM equaled or exceeded 120% of the established goal. See id., ¶¶ 24, 27. Defendants agree with the formula but argue that any final allocation of the payout was subject to review and adjustment under the discretionary provisions of the Incentive Plan. See Defendant's Response to PSOMF, ¶27. In addition, plaintiffs contend that the Rochester CMM finished the 2000 Incentive Plan year at 156.86% of the established goal. See id., ¶ 29. Defendants argue that the Rochester CMM team finished the 2000 Incentive Plan year with a CM of 156.2%. See Defendant's Response to PSOMF, ¶29.

During the second quarter of 2000, KeyBank amended the Incentive Plan ("Plan Amendment") relating to the midyear payout for Incremental Revenue ("IR"). See PSOMF, ¶30.[3] The Plan Amendment did not change the way in which the incentive compensation was to be calculated and the amount that could be earned by eligible employees. See id., ¶¶32-33. No other provision of the Incentive Plan was

---

[3]Individual awards for TSLs and RMs are based on Incremental Revenue generated.

affected by the Plan Amendment other than the midyear payout for IR. See id., ¶34. In addition, plaintiffs received monthly scorecards from defendant which provided them with information regarding their individual and team performances as it related to budgeted goals. See id., ¶36. On or about December 22, 2000, plaintiffs, among others, received written correspondence from Auletta indicating that several large payouts needed to be evaluated in relation to their size and overall growth of the team's earning's. See id., ¶37. Plaintiffs claim that at no point before December 22, 2000 did they receive any notification from KeyBank that their accrued incentive compensation would be subject to review or modification. See id., ¶ 39. Defendant argues that the terms and conditions of the Incentive Plan put plaintiffs on notice that their year-end payments could be reduced. See Defendant's Response to PSOMF, ¶39. Plaintiffs first became aware that their incentive compensation was reduced by way of letter dated March 7, 2001. See PSOMF, ¶41.

## DISCUSSION

### I.   Standard of Review

#### a.   The Parties' Motions for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. See Scott v. Harris, 550 U.S. 372, ___; 127 S.Ct. 1769, 1776 (2007). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. See Scott, 550 U.S. at ____; 127 S.Ct. at 1776 (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587.

### b.   Local Rules Requirements

The Local Rules of the Western District of New York provide that a party moving for summary judgment must submit a "Statement of Facts" which requires that the moving party include with its motion for summary judgment a "separate, short, and concise statement of the material facts to which the moving party contends there is no genuine issue to be tried." See W.D.N.Y. Loc. R. Civ. P. 56.1(a). The Local Rules also provide that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)," with citations identifying "with specificity" the relevant page or paragraph of the cited authority. See id. R. 56.1(d). Both parties have complied with this rule.

Once a properly supported Local Rule 56.1(a) Statement is submitted, "[t]he papers opposing a motion for summary judgment shall

include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." See W.D.N.Y. Loc. R. Civ. P. 56.1(b). Plaintiff did not initially comply with Rule 56.1(b). Accordingly, the third paragraph of Rule 56.1 comes into play. It reads: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless* controverted by the statement required to be served by the opposing party." See id. R. 56.1(c) (emphasis added).

While plaintiffs counsel states in the plaintiffs reply papers that counsel "does not read Rule 56.1(b) of the Local Rules to mandate an explicit admission or denial of every factual allegation made by Defendant," this is not a license not to comply with the strict procedural requirements of Local Rule 56.1(b). The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying [Local Summary Judgment Rule] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive [Local] Rule statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam) (accepting as true material facts

contained in unopposed local rule statement of material facts); Eastman Kodak Co. v. W.H. Henken Indus., Inc., 2007 WL 1726472, *2 (W.D.N.Y. 2007) ("[a]ll material facts stated in movant's statement that are not controverted by opponent's counter-statement shall be deemed admitted").

It is clear that plaintiffs committed a procedural error when they initially failed to file a 56.1(b) Statement of Facts in response to defendants statement of material facts. However, plaintiffs have subsequently attempted to correct this error in their reply papers.

## II.  Contractual Obligations Under the Incentive Plan

To prevail on a claim for breach of contract under New York law, a plaintiff must show (1) the existence of a contract, (2) performance by the plaintiff, (3) a breach by the defendant, and (4) damages resulting from that breach. See Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir.2000). An employee cannot establish that an employer breached a contract to pay a particular amount of bonus compensation where the employer retains discretion regarding the amount of bonus compensation to be awarded. See Namad v. Salomon, Inc., 74 N.Y.2d 751, 753 (1989); see also Welland v.. Citigroup, Inc., 2003 WL 22973574, at *15 (S.D.N.Y.2003).

Defendants contend that the terms of the Incentive Plan did not mandate the payment of incentive awards but afforded KeyBank the discretion to do so. See Def. Br. 13-14. According to defendant, the

Incentive Plan unambiguously vested KeyBank with absolute discretion to modify plaintiffs incentive awards and to determine the amount of any benefit received by plaintiffs. See id. Plaintiffs argue that Section 1, entitled Plan Summary, of the Incentive Plan provides that the individual and team award components are non-discretionary and as such KeyBank does not have the discretion to modify plaintiffs' team awards. See Pls. Br. at 10-13. It is well-established that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive. See Culver v. Merrill Lynch & Co., 1995 WL 422203, at *3 (S.D.N.Y.1995); see also Valentine v. Carlisle Leasing Int'l, 1998 WL 690877, at *3 (N.D.N.Y.1998) (citations omitted); Canet v. Gooch Ware Travelstead, 917 F.Supp. 969, 985 (E.D.N.Y.1996); Namad, 74 N.Y.2d at 753.

When finding that a specific contract vested an employer with the absolute discretion whether to award incentives, courts have relied on clauses that "unambiguously" vest such power. See Namad, 74 N.Y.2d at 753; see also Valentine, 1998 WL 690877, at *3 (finding employer had discretion where terms provided that employee would be eligible for a bonus but was not promised one, and that the bonus depended on both the performance of the employee and the company); Sathe v. Bank of New York, 1990 WL 58862, at *3 (S.D.N.Y.1990) (no obligation existed where compensation provided that "[n]othing in this Plan shall give rise to any special compensation or other sum

under this Plan unless and until any such amounts shall have been paid to such individual, and prior to such payment the Chairman shall have the power to revoke and nullify any and all steps previously taken towards making any award to any person");[4] <u>Diakoff v. American Re-Insurance Co.</u>, 492 F.Supp. 1115, 1120 (S.D.N.Y.1980) (finding discretion where clause provided that profit-sharing "shall be allotted among all or any of the participants and in such proportions as the Committee shall determine, and all amounts allotted to any participant shall be subject to the approval of the board of directors"); <u>Foss v. Am. Tel. & Telegraph Co.</u>, 199 A.D.2d 668, 669 (3d Dep't 1993) (discretion existed where employer reserved the right to "reduce, modify, or withhold compensation based on...management determination of special circumstances at any time for any reason without prior notice").[5]

I find that the plain language of the Incentive Plan at issue, defendant was unambiguously vested with absolute discretion to modify any and all award allocations and accordingly defendant was vested with the power to modify plaintiffs' incentive awards. <u>See</u> Incentive Plan, §§3.1, 3.2, 3.8, 3.11 and 3.12. As stated above, the Incentive Plan provides in relevant part that KeyBank: "shall have sole and

---

[4]The Court in <u>Sathe</u> held that such language gave "the Chairman discretionary power to do anything he deems appropriate for any reason as to the payment of a bonus." <u>See Sathe</u>, 1990 WL 58862, at *3.

[5]In <u>Foss</u>, the plaintiff claimed to be entitled to compensation in the amount of $140,628.62, pursuant to the terms of the incentive compensation plan. <u>See Foss</u>, 199 A.D.2d at 669. However, over plaintiff's objection, senior management limited his commission to $100,000, and distributed the remaining commission to others, including plaintiff's supervisor. <u>See id.</u>

absolute discretionary authority and power to...determine all questions relating to the eligibility for and the amount of any benefit to be paid under the Plan[.]" <u>See</u> Incentive Plan, §3.11. In addition, the Incentive Plan provided that "KeyCorp may, in its sole and absolute discretion...modify Participant's performance objectives [and/or] modify applicable Plan incentive goals....Such modifications may be made on a retroactive basis if KeyCorp determines that such modifications are necessary to accurately reflect the actual rather than the projected or anticipated rate of earnings[.]" <u>See</u> <u>id.</u>, §3.2. The Incentive Plan also retained in KeyCorp "the absolute and unconditional right at all times to...increase, decrease or terminate any, and all incentive awards to be paid under the Plan" and "to take such further action as [KeyBank] shall deem necessary ... in the administration of the Plan." <u>See</u> <u>id.</u>, §§ 3.1, 3.11.

The above language is clear and unambiguous and provides in no uncertain terms that the final determination as to the amount of the team awards was in the sole discretion of the Plan Administrator, i.e. defendant. <u>See</u> <u>id.</u>, §§ 3.1, 3.2., 3.11. Unlike the agreement in <u>Culver</u>, the Incentive Plan in this case contains the "magic words" that relegate the payment of compensation incentives to the discretion of KeyBank management. <u>See</u> <u>Culver</u>, 1995 WL 422203, at *3. Indeed, Section 3.8 of the Incentive Plan gives the defendant, as Plan Administrator the discretion to "verify the amount of incentive awards, if any, to be paid to the Participant in accordance with the

provisions of the Plan." <u>See</u> Incentive Plan §3.8.[6] Further, Section 3.12 reserves in defendant "the right to amend and/or terminate the Plan at any time...and to modify or amend the Plan, in whole or in part, at any time and for any reasons." <u>See</u> <u>id.</u>, §3.12. Accordingly, the above clauses contemplate that any adjustment could be carried out in accord with the Plan's terms and conditions, and at KeyBank's discretion. Thus, those clauses unambiguously reserved for KeyBank the right to make adjustments with respect to the team component of plaintiffs' respective awards under the Incentive Plan. Ferrari and Moore were entitled to, and did receive, total incentive compensation awards in the amounts of $158,356.00 and $65,987.00 respectively. The Court finds that these adjustments were within defendant's discretionary authority under the Incentive Plan.

Plaintiffs contend however, that defendant breached the express terms of the Incentive Plan by refusing to pay plaintiffs' team incentive compensation awards in accordance with the non-discretionary formula set forth in the Incentive Plan. <u>See</u> Pls. Br. at 8. In support of this contention, plaintiffs rely on language found in the Plan Summary. In addition, plaintiffs argue that any ambiguities in a contract should be construed against the drafter. <u>See</u> <u>id.</u> at 10 (citing <u>Thompson v. Saatchi & Saatchi Holdings (USA), Inc.</u>, 958 F.Supp.808, 827 (W.D.N.Y.1998)). While defendant agrees

---

[6]Section 3.8 also states that "[t]he reasonable and equitable decision of the Plan Administrator as to the value of each incentive award shall be conclusive and binding upon all Participants[.]"

that ambiguities in a contract should be construed against the drafter, defendant also contends that a particular language of a document prevails over the more general language. See Def. Response Br. at 6-7;[7] see also John Hancock Mutual Life Ins. Co. v. Carolina Power and Light Co., 717 F.2d 664, 669 n. 8 (2d Cir.1983) (It is a fundamental principle of contract interpretation that "definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary"). The Court agrees with defendant that if a specific and a general provision of a contract conflict, the specific provision governs. See John Hancock, 717 F.2d at 670; Bank of Tokyo-Mitsubishi Ltd. v. Kvaerner, 243 A.D.2d 1, 14 (1st Dep't 1998); see also Bowmer v. Bowmer, 50 NY2d 288, 294 (1980) ("the rule of construction [is] that ... the specific provisions tend to restrict the general").

The Court finds that the language of the Incentive Plan is not ambiguous as claimed by plaintiffs as to whether the individual and team award components of the Incentive Plan are non-discretionary. The term relied upon by plaintiffs in asserting that the individual and team awards are non-discretionary is general and preliminary and thus must yield to the more specific terms found in later sections of the Incentive Plan. See Aramony v. United Way of Am., 254 F.3d 403,

---

[7]Defendant contends that it does not dispute the existence of the term relied upon by plaintiffs in asserting that the individual and team awards are non-discretionary. See id. However, defendant argues that the term relied upon by plaintiffs is general and preliminary in that it can be found only in Section 1 entitled Plan Summary. See id. Also, the term relied by plaintiffs specifically states that the "[s]pecific details are provided in Section 2." See id.

413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'") (citations omitted). There are several specific discretionary provisions in the Incentive Plan that support KeyBank's position. Section 2 explicitly provides that "[m]easurement of the Team level performance...will be made by the KeyBank Corporate Capital & Special Finance Unit group, Commercial Bank LOB Executive, and the Plan Administrator." <u>See</u> Incentive Plan §2 at 3, 5.

Further, later sections of the Incentive Plan, as discussed above, expressly retain in defendant the right to modify the amounts of any awards distributed. <u>See</u> <u>id.</u>, §§ 3.1, 3.2, 3.8, 3.11, 3.12; <u>see also</u> <u>Thompson</u>, 958 F.Supp. at 825 (Court recognized that "[a] promise to pay a bonus is unenforceable...if the written terms of the bonus Plan make clear that the employer has 'absolute discretion' in deciding whether to grant or pay a bonus"). Accordingly, Sections 2 and 3 are precise, definitive and have particularized the terms of the Incentive Plan. Any inconsistent statement contained in Section 1 (Plan Summary) must yield to the more specific terms of Sections 2 and 3. Defendant exercised its discretionary authority to reduce the amount of plaintiffs' awards. Therefore, defendant's motion for summary judgment based on the first cause of action for breach of contract is granted. Plaintiffs' cross-motion for summary judgment is denied.

### III. <u>The Covenant Of Good Faith And Fair Dealing</u>

Defendant next argues that plaintiffs' claim for breach of the covenant of good faith and fair dealing under New York law must be dismissed since it is duplicative of plaintiffs' breach of contract claim. Plaintiffs respond that its claim for breach of the covenant exists as a separate cause of action distinct from its breach of contract claim and should thus be sustained. The Court agrees with defendant and grants summary judgment in favor of the defendant on this cause of action.

Under New York Law, there is an implied covenant of good faith and fair dealing implicit in every contract. See <u>M/A Com Sec. Corp. v. Galesi</u>, 904 F.2d 134, 136 (2d Cir. 1990); <u>Alter v. Bogoricin</u>, 1997 WL 691332, at *7 (S.D.N.Y.1997); see also <u>Horn v. N.Y. Times</u>, 100 N.Y.2d 85, 92 (2003); <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384 (1995) (It is axiomatic that implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance). "The covenant of good faith and fair dealing 'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" See <u>Leberman v. John Blair & Co.</u>, 880 F.2d 1555 (2d Cir. 1989)(quoting <u>Filner v. Shapiro</u>, 633 F.2d 139, 143 (2d Cir. 1980)); see also <u>M/A Com Sec.</u>, 904 F.2d at 136 (Covenant implies that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of another party to receive the fruits of the contract[.]) An implied obligation

cannot, however, be inconsistent with the explicit terms of the contractual relationship. See Murphy v. Am. Home Prod. Corp., 58 N.Y.2d 293, 303 (1983).

New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim. See Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir.2002); See Ari and Co. v. Regent Int'l Corp., 273 F.Supp.2d 518, 522 (S.D.N.Y.2003). Courts have dismissed claims for breach of the implied covenant of good faith as "redundant where the conduct allegedly violating the implied covenant is also the predicate for breach ... of an express provision of the underlying contract." See Alter, 1997 WL 691332 at *7 ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract, and therefore, 'as a general rule, the cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract[.]") (citations omitted); W.S.A., Inc. v. ACA Corp., 1996 WL 551599, at *9 (S.D.N.Y.1996) ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of the implied covenant of good faith and fair dealing has dismissed the latter claim as duplicative.")

Consequently, a claim for breach of the implied covenant of good faith can survive "only if it is based on allegations different from those underlying the accompanying breach of contract claim." See

Siradas v. Chase Lincoln First Bank, 1999 WL 787658, at *6 (S.D.N.Y. 1999). Moreover, where the relief sought in claiming a breach of the implied covenant of good faith is "intrinsically tied to the damages allegedly resulting from [the] breach of contract," there is no separate and distinct wrong that would give rise to an independent claim. See Alter, 1997 WL 691332, at *8. Here, plaintiffs base their claim on KeyBank "retroactively changing the formula, method of calculation or plan interpretation for remunerations and refusing to pay the amounts earned by the Plaintiffs." See Compl., ¶20. In addition, the relief sought under the breach of the implied covenant claim, which is unpaid incentive compensation allegedly earned by plaintiffs, is "intrinsically tied to the damages allegedly resulting from [the] breach of contract, in that the two are identical. See Alter, 1997 WL 691332, at *8. Plaintiffs' failure to allege "retroactively changing the formula, method of calculation or plan interpretation" as it relates to the breach of contract claim does not create a separate cause of action under the guise of breach of the implied covenant of good faith and fair dealing.

Plaintiffs contend that defendant breached the covenant of good faith and fair dealing through its bad faith "in the timing of its decision to reduce Plaintiffs' awards and its determination to single out the Plaintiffs for significant reductions." See Pls. Br. at 16. Defendant claims that even if plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is not duplicative of

their breach of contract claim, the cause of action must fail as a matter of law since no bad faith was exercised by defendant. See Def. Response Br. at 16. The New York Court of Appeals has held repeatedly that "'[n]o obligation can be implied ... which would be inconsistent with other terms of the contractual relationship.'" See Horn, 100 N.Y.2d at 92 (internal quotation omitted). Accordingly, a "defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract[ ]...." See DCMR v. Trident Precision Mfg., 317 F.Supp.2d 220, 226 (W.D.N.Y.2004) (internal quotations omitted).

In this case, the Incentive Plan vested defendant with "absolute discretionary authority and power...to determine all questions relating to the eligibility for and the amount of any benefit to be paid under the Plan." See Incentive Plan §3.11. Significantly, each participant, as a condition precedent to participating in the Incentive Plan, acknowledged that defendant had the power to modify the terms and conditions of the Incentive Plan including increasing, decreasing or terminating any, and all incentive awards to be paid under the Incentive Plan where the happening of certain events "result in an unanticipated or unintentional calculation, amount, duration or structure of any incentive payment(s)...." See id., §3.1. In this regard, the timing of the notification to the plaintiffs sent at the end of December, which stated that defendant was undertaking a review of the Incentive Plan and certain payouts, was not unduly

delayed, and was reasonable under the circumstances and in line with defendant's rights under the Incentive Plan. Accordingly, defendant was exercising its rights under the express terms of the Incentive Plan. Thus, plaintiffs' third cause of action for breach of the covenant of good faith and fair dealing is dismissed.

## IV. <u>Promissory Estoppel</u>

To state a claim under the theory of promissory estoppel, a plaintiff must demonstrate that the defendant made a clear and unambiguous promise, that the plaintiff reasonably relied on that promise, and that the plaintiff was injured as a result of his reliance on the promise. <u>See</u> <u>Kaye v. Grossman</u>, 202 F.3d 611, 615 (2d Cir. 2000). The doctrine of promissory estoppel is a "narrow doctrine" which generally applies only where there is no written contract, or where the parties' written contract is unenforceable for some reason. <u>See</u> <u>DDCLAB Ltd. v. E.I. Du Pont de Nemours and Company</u>, 2005 WL 425495 at *6 (S.D.N.Y.2005); <u>In re Gulf Oil/Cities Service Tender Offer Litig.</u>, 725 F.Supp. 712, 735 (S.D.N.Y.1989); <u>see also</u> <u>Bell v. Leakas</u>, 1993 WL 77320 at *9 (S.D.N.Y.1993) ("Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract.'") (quotations omitted); <u>Cyberchron Corp. v Calldata Systems Develop.</u>, 831 F.Supp. 94, 112 (E.D.N.Y.1993) (holding that promissory estoppel is "applicable only in absence of an enforceable contract"), aff'd in relevant part,

vacated in part, 47 F.3d 39, 45 (2d Cir.1995) (upholding application of promissory estoppel as a substitute for consideration).

In the instant case, plaintiffs have alleged the existence of a contractual relationship which precludes plaintiffs from proceeding under a theory of promissory estoppel. There is no dispute that plaintiffs and defendant entered into the Incentive Plan, which was a valid and enforceable written contract governing their employment relationship. Indeed, plaintiffs have admitted that the contract is enforceable by affirmatively alleging that the Incentive Plan entitled them to the payments they seek. Further, to the extent that plaintiffs attempt to recover based on alleged promises that contradict the express terms of the Incentive Plan, the plaintiffs claim must fail. Thus, I grant defendant's motion for summary judgment dismissing Count Six of plaintiffs' Complaint.

### V.   Unjust Enrichment Claim

The elements of an unjust enrichment claim under New York law are (1) a benefit to the defendant (2) at the plaintiff's expense, which (3) in "equity and good conscience" should be restored. See Kaye, 202 F.3d at 616. Defendant argues that plaintiffs' claim of unjust enrichment is barred because an enforceable contract governs the subject matter of the current dispute. See Def. Br. at 19. Under New York law, quasi-contractual claims such as unjust enrichment are barred if a written contract between the parties governs the subject matter of their dispute. See Briggs v. Goodyear Tire & Rubber Co., 79

F.Supp.2d 228, 236 (W.D.N.Y.1999); <u>Gidatex S.r.L. v. Campaniello Imports, Ltd.</u>, 49 F.Supp.2d 298, 301 n. 4 (S.D.N.Y.1999); <u>Nelson v. Stanley Blacker, Inc.</u>, 713 F.Supp. 107, 111 (S.D.N.Y.1989); see also <u>Clark- Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382 (1987) (New York Court of Appeals held that the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")

Here, the Incentive Plan governs the entire subject matter of the dispute between the parties, which involves the allocation of any incentive compensation award under the Incentive Plan. Under the explicit discretionary language of the contract, KeyBank, as Plan Administrator, acted within its authority to reduce plaintiffs' incentive compensation award. Accordingly, the claim for unjust enrichment is simply redundant of the breach of contract claim. Therefore, plaintiffs' unjust enrichment claim (Count Seven) as against defendant is dismissed.

### VI.   <u>New York Labor Law</u>

Plaintiffs allege that their annual compensation awards were part of their wages as employees of KeyBank, the nonpayment of which violated article 6 of New York Labor Law. <u>See</u> N.Y. Labor Law §§ 190, 198. Section 190 defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."

See N.Y. Labor Law § 190(1). The Court finds that plaintiffs' awards do not constitute "wages" within the meaning of section 190(1).

Under New York law, "incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage." See Tischmann v. ITT/Sheraton Corp., 882 F.Supp. 1358 (S.D.N.Y.1995); Samuels v. Thomas Crimmins Contracting Co., 1993 WL 36168, at *7 (S.D.N.Y.1993) (promised bonus was incentive compensation not covered by section 190(1) where it was not based on the employee's performance); Quirk v. Am. Management Sys., Inc., 2002 WL 31654966 at *2 (S.D.N.Y.2002) (court held that an incentive compensation plan based on factors other than individual performance was not "wages" within the statutory definition of Labor Law §190(1)); Dean Witter Reynolds, Inc. v. Ross, 75 A.D.2d 373 (1st Dep't 1980) (incentive plan tying an employee's bonus to overall output rate of the department fell outside the purview of section 190); see also Canet, 917 F.Supp. at 995 ("The weight of authority holds that incentive compensation does not constitute 'wages' under the New York Labor Law."); Magness v. Human Resource Serv., Inc., 161 A.D.2d 418 (1st Dep't 1990).

Further, an "employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." See Hall v. U.P.S., 76 N.Y.2d 27, 36 (1990). However, this rule is limited by the "long standing policy against the forfeiture of earned wages." See Weiner v. Diebold Group, Inc., 173 A.D.2d 166, 167 (1st Dep't 1991). "Thus,

if the incentive [bonus] compensation payments were payments of earned wages, a plaintiff could not contract to forfeit them." <u>See</u> <u>id.</u> Plaintiffs claim that their awards were earned prior to any modifications made by defendant and that the Calculator and other objective benchmarks such as the IR and CM gave plaintiffs a contractual right to the awards. <u>See</u> Pls. Br. at 18. However, the facts demonstrate that plaintiffs' awards were not earned until the preliminary incentive awards were reviewed and finally allocated to each participant of the Incentive Plan. Thereafter, the incentive awards were distributed. Thus, plaintiffs' entitlement is governed by defendant's Incentive Plan since their award does not constitute earned wages. <u>See</u> <u>Weiner</u>, 173 A.D.2d at 167.

The statutory definition of wages "excludes certain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise." <u>See</u> <u>Truelove v. Northeast Capital</u>, 95 N.Y.2d 220, 223-24 (2000); <u>see</u> <u>also</u> <u>Ireton-Hewitt v. Champion Home Builders Co.</u>, 501 F.Supp.2d 341, 353 (N.D.N.Y.2007). Moreover, when a bonus plan does "not predicate bonus payments upon a plaintiff's own personal productivity nor give a plaintiff a contractual right to bonus payments based on his productivity...the plaintiff's bonus payment is out of the statutory definition of wages," and an employee's eligibility for bonus payments is governed by the terms of the employer's bonus plans. <u>See</u> <u>Truelove</u>, 95 N.Y.2d at 224; <u>Hall</u>, 76 N.Y.2d at 36.

Plaintiffs next argue that their awards were not dependent on the financial success of defendant and that the team award component was based on individual effort. <u>See</u> Pls. Br. at 19. Defendant's Incentive Plan reflected a combination of individual, team and company performance.[8] Specifically, the Incentive Plan had a team award component which "use[d] a formula to develop a number that would be considered but not final" in making a team award. <u>See</u> DSOMF, ¶12. That formula measured team performance against the team contribution margin goal. Measurement of team performance was made by the Plan Administrator, in its sole discretion and was to be "conclusive and binding on all Participants." <u>See</u> Incentive Plan, §3.8.[9] In addition, defendant, in its sole discretion was permitted to modify performance objectives and incentive goals "on a retroactive basis if KeyCorp determine[d] that such modifications [were] necessary to accurately reflect" the intended compensation structure of the Incentive Plan. <u>See</u> Incentive Plan, §3.2. Thus, the Incentive Plan is more in the nature of a profit-sharing arrangement and contingent and dependent, at least in part, on the financial success of the company. <u>See</u> <u>Truelove</u>, 95 N.Y.2d at 224. The undisputed facts demonstrate that plaintiffs' award compensation did

---

[8]Funding was derived largely from defendant's commercial bank line of business performance. Once funding was derived, individual and team performance was evaluated.

[9]The Incentive Plan retained in defendant the power to modify any allocation under the Incentive Plan. It provided that "[i]n the event that (1) the design, structure and/or operation of the Plan or (2) unanticipated market related events or circumstances, result in an unanticipated or unintentional calculation, amount, duration, or structure of any incentive payment(s) to be made under the Plan...." <u>See</u> Incentive Plan §3.1.

not satisfy the statutory definition of earned wages under Article 6 of the Labor Law. See id.; N.Y. Labor Law §190(1). Finally, as in Dean Witter, plaintiffs received a fixed salary that was unaffected by their rate and quality of performance. See 75 A.D.2d at 381; see also Magness, 161 A.D.2d 418 ("supplemental income" in addition to salary is "clearly incentive compensation as not 'wages' pursuant to Labor Law § 190(1)"). Thus, defendant's summary judgment motion on plaintiffs' second, fourth and fifth causes of action are granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment on all counts of the Complaint is granted. Plaintiffs' cross-motion for summary judgment is denied. Accordingly, plaintiffs' Complaint is dismissed in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

  s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          January 5, 2009